# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-1018V

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| | \* | |
| M.K.S., | \* | Chief Special Master Corcoran |
| | \* | |
| Petitioner, | \* | Filed:  January 29, 2026 |
| | \* | |
| v. | \* | |
| | \* | |
| SECRETARY OF HEALTH AND | \* | |
| HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Zachary J. Hermsen*, Whitfield & Eddy Law, Des Moines, IA, for Petitioner.

*Mary Novakovic*, U.S. Department of Justice, Washington, DC, Respondent.

### **RULING ON ENTITLMENT**[1]

On March 2, 2021, M.K.S. filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petition (ECF No. 1) at 1. Petitioner alleges that his receipt of the tetanus, diphtheria, and pertussis ("Tdap") vaccine on March 9, 2018, caused him to develop Myelin Oligodendrocyte Glycoprotein Antibody Disease ("MOGAD"). *Id.*

An entitlement hearing in the matter was held in Des Moines, IA, on February 10, 2025. Now having reviewed the record, all expert reports, the medical records, and associated literature, I find entitlement has been preponderantly established.

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

I.      I.      **Factual Background**

*Vaccination and Initial Presentation*

On March 9, 2018, Petitioner, then forty-one years old, received a Tdap vaccine during his annual exam from his primary care physician ("PCP"), Dr. Lawrence Hutchison, at Tri-State Family Practice in Dubuque, Iowa. Ex. 4 at 14–16. At this time, Petitioner reported no ongoing complaints or concerns—specifically no complaints of headache or other neurological symptoms. *Id.* Petitioner's prior medical history was only significant for excessive drinking, although at the time of vaccination he had curtailed his alcohol consumption.[3] *Id.* at 14.

Fifteen days later, on March 24, 2018, Petitioner took himself to an urgent care center complaining of a headache for five days and double vision for four days (meaning beginning on March 20th – 21st). Ex. 2 at 86. He further reported having a fever, chills, sweats, some nausea, and no appetite for three days. *Id.* The treating physician documented no evidence of upper respiratory infection symptoms, photosensitivity, or vomiting. *Id.* The impression was a headache with visual changes, but because serologic testing revealed that Petitioner had an elevated white blood cell ("WBC") count of 17.8, as well as an increase in his absolute neutrophil count at 15.1 thou/mcL (normal range 0.2 – 0.8), he was transferred to the Mercy Medical Center's Emergency Department ("ED") for further evaluation. *Id.* at 86–87.

At the ED, Petitioner complained of a headache, sweats, and fluctuating body chills, although the treating ED physician did not document any current fevers. Ex. 5 at 518. Following a neurological examination, Petitioner demonstrated no focal deficit, his motor nerves at CN II-XII were intact, as were his sensation, speech, and coordination. *Id.* at 589. Petitioner underwent a head CT scan which revealed no acute intracranial abnormalities. *Id.* at 593. He was later discharged that same day. *Id.* at 591.

The next day, on March 25, 2018, Petitioner went to Medical Associates Urgent Care reporting dysuria[4] and suprapubic pain that started one day prior. Ex. 5 at 80. Petitioner's abdominal, genitourinary, musculoskeletal, and neurological exams were all within normal limits, and his reflexes were also normal. Ex. 2 at 80. Petitioner was catheterized and diagnosed with acute urinary obstruction and adverse drug effect. *Id.* at 85.

---

[3] Although it seems plausible Petitioner's alcohol intake, and subsequent cessation of it, might have played a role in his disease development (*See, e.g.*, First Lancaster Report (Ex. A) at 2, 3, 5), this possibility was not developed in the case by Respondent (nor did treaters ultimately place much stock in it in any event). *See* Ex. 5 at 137–41.

[4] "Dysuria" is defined as "1. Painful urination. 2. Any difficulty of urination." *Dysuria*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15325&searchterm=dysuria (last visited Jan. 29, 2026).

*Treatment from March 2018 to April 2018*

Petitioner returned to the ED on March 26, 2018, with complaints of weakness, a headache that he described as severe, dull, and throbbing for the past six days, and blurred vision over the past five days. Ex. 6 at 3, 6. He further reported worsening bodily weakening and stated that he could not walk. *Id.* at 11. The treating ED physician's impression was viral meningitis versus viral encephalitis or serotonin syndrome. *Id.* Petitioner was subsequently transferred to the University of Iowa's Hospital and Clinics ("UIHC") for further evaluation and care. *Id.* at 9.

Upon admission to UIHC, Petitioner underwent a brain MRI which revealed no acute intracranial findings. (An addendum to this record was added, however, on March 29, 2018, noting a mild increased FLAIR signal change within the hippocampus, as well as on coronal T2. Ex. 7 at 7104). These results raised suspicion for herpes simplex encephalitis as a diagnostic explanation for Petitioner's condition. *Id.* A lumbar puncture was also now performed, for the first time. Ex. 7 at 6435–442.[5] It revealed both elevated protein and WBC levels significantly higher (339) than what has been observed in serologic testing a few days prior. *Id.* A panel for meningitis/encephalitis was negative, however.

Petitioner was later evaluated by Sarika Deshmukh, M.D., a nephrologist, on March 27, 2028. Ex. 7 at 6453–56. She opined that Petitioner had encephalopathy, likely secondary to viral meningitis. *Id.* at 6455. Petitioner also saw infectious disease specialist Philip Polgreen, M.D., who documented significant improvement in Petitioner's condition. *Id.* at 6458. Petitioner not only reported pain levels as low as a three or four out of ten, but it was further noted that his word-finding difficulty was a predominant symptom more suggestive of a viral encephalitis and meningitis. *Id.* at 6459. Bacterial meningitis, however, was not officially ruled out at this time. *Id.*

On March 29, 2018, Petitioner's wife reported that he was confused overnight, and following a review of his MRI, neurologist Annie Killoran, M.D., noted some subtle asymmetry of Petitioner's left temporal lobe, and radiology agreed with this assessment. Ex. 7 at 6465. Records further indicated that Petitioner had experienced a seizure (although it is unclear whether the seizure occurred on March 28th, when he experienced an acute increase in confusion, or later). *Id.* That same day, Petitioner saw his infectious disease treater, at which time he was more confused, had an elevated temperature, and attempted to get out of bed multiple times despite being told not to do so. From March 29, 2018, to April 1, 2018, Petitioner was on a continuous EEG. *Id.* at 7116. Although the EEG revealed no evidence of seizures, there was evidence of encephalopathy. *Id.*

Petitioner began physical therapy ("PT") on April 3, 2018. Ex. 7 at 6516. During this initial session, Petitioner was able to get up, put on socks, and walk slowly in a tandem gait pattern. *Id.* Infectious disease specialist Daniel Livorsi, M.D., highlighted Petitioner's initial response to PT,

---

[5] A lumbar puncture performed earlier at that time was unreliable due to a bloody tap. Ex. 6 at 10.

followed by his worsening condition[6], and expressed a concern for autoimmune encephalitis such as anti-NMDA receptor encephalitis—noted further to be well described following HSV encephalitis. Ex. 7 at 6516.

On April 8, 2018, Petitioner experienced worsening agitation and confusion, and he was noted to be less responsive, tachycardic, and febrile. Ex. 7 at 6583. Due to his worsening encephalopathy and concern for airway protection, Petitioner was transferred to the intensive care unit ("ICU") at UICH. *Id.* Upon presentation to the ICU, Petitioner demonstrated a "very rigid bilateral [lower extremity]" and "clonus." *Id.* at 6586. Petitioner eventually became persistently unresponsive and was intubated. *Id.* The next day, on April 9, 2018, Petitioner's neurologist, Brian Gehlbach, M.D., observed him as obtunded, mildly distressed, and mechanically ventilated. *Id.* at 6596. He was later seen by an allergy and immunology specialist, Zuhair Ballas, M.D., who considered both an infectious and autoimmune etiology. *Id.* at 6612. Dr. Ballas further noted that Petitioner's family history was significant for autoimmunity, as well as a history of an immune deficiency that was likely secondary to a history of alcoholism. *Id.*

Three days later, on April 11, 2018, Petitioner underwent another brain MRI—the results of which revealed new findings suggestive of possible acute disseminated encephalomyelitis ("ADEM"). Ex. 7 at 6642. Petitioner also underwent a brain biopsy which showed a pathology more indicative of an inflammatory etiology. *Id.* at 47, 7068. However, Petitioner's treating physicians still could not rule out an infectious process. On April 16, 2018, another brain MRI revealed interval increase of diffuse T2/FLAIR signal abnormalities throughout his brain that were consistent with worsening ADEM. *Id.* at 7090. Petitioner discussed his condition with infectious disease specialist, Judy Streit, M.D., on April 18, 2018, who noted a working diagnosis of an immune-mediated process. *Id.* at 6797. Specifically, it was noted that Petitioner's encephalitis panels and brain biopsies were consistent with a possible bacterial and HSV meningitis and encephalitis. *Id.* Dr. Streit documented Petitioner's immediate clinical improvement in response to immunosuppression therapy followed by a plateau with persistent deficits which was consistent with ADEM. *Id.* at 6799.

Petitioner saw a member of his neurology team, Frank Bittner, D.O., on April 20, 2018, who reviewed his lab results from the Mayo Clinic. These results indicated "MOG assay was positive as can be seen in ADEM, treating ADEM was recommended and recheck MOG assay at 6 months. If MOG is negative when rechecked, then it may indicate that ADEM and +MOG was post infectious and more likely monophasic."[7] *Id.* He was later discharged on April 25, 2018, with a diagnosis of ADEM, post-infectious encephalopathy. Ex. 7 at 6876. Petitioner's discharge

---

[6] Despite some improvement in his physical strength during his initial PT session, Petitioner still continued to demonstrate "significant impairments" overall. Ex. 7 at 5211–12, 5290, 5293. Records indicated that Petitioner's processing was "quite delayed," he had difficulty walking, and he continued to spike fevers. *Id.* at 4989–90, 6568.

[7] Respondent notes in his Rule 4(c) Report that it appears Petitioner did not have the MOG assay rechecked at six months.

summary included a note stating Petitioner's presentation appeared to be viral meningitis versus another central nervous system ("CNS") infectious process, and further commented on the unremarkable results of his infectious disease workup. *Id.* at 6876–77.

*Inpatient Rehabilitation Care from April 2018 to May 2018*

On April 25, 2018, Petitioner was transferred to the Mercy Medical Center Rehabilitation. Ex. 5 at 137. Upon examination, Petitioner was cooperative, alert, and oriented to person and place, although he had some difficulty with speech and understanding time. *Id.* Treating physician Philip Spence, M.D., documented that Petitioner had poor mobility, imbalance, expressive aphasia, and decreased cognition secondary to ADEM related to viral meningitis. *Id.* at 141. Petitioner was discharged approximately one week later, on May 3, 2018. *Id.* at 112. Petitioner was advised to follow-up with neurology, continue PT and OT, as well as continue speech therapy to continue addressing his expressive aphasia and cognition. *Id.*

*Outpatient Care from May 2018 to December 2020*

Petitioner completed his Prednisone taper on June 13, 2018. Ex. 7 at 7154. Approximately two weeks later, on June 29, 2018, Petitioner saw an ophthalmologist reporting worsening left eye pain, blurred vision, pain with eye movement, as well as a headache. Ex. 1 at 2. He was diagnosed with bilateral optic neuritis and steroids were recommended. *Id.* at 3. Doctors at UIHC determined that Petitioner was experiencing a "flare related to his initial episode of ADEM" and ordered "a course of high-dose intravenous steroids." Ex. 20 at 16. His treaters further noted the potential for "a long-term disease modifying agent"; however, opted to delay such treatment "until there [was] more sufficient evidence that this is not a monophasic disease." Ex. 7 at 7184.

Almost a year later, on May 31, 2019, Petitioner went to Medical Associates Clinic in Dubuque complaining of cloudiness and pain with movement in the left eye over for the last week. Ex. 2 at 66. An MRI revealed "moderate enhancement of the left optic nerve which is a new finding when compared to the prior MRI from 2018." *Id.* at 130. Doctors indicated that Petitioner's optic neuritis was likely "MOG related," but stated further that it was "unclear if the relapse of optic neuritis was secondary to new flare of the disease or if it was secondary to rapid taper of steroids." Ex. 7 at 7395.

By June 2, 2019, Petitioner reported "80% recovery" with the issues in his left eye, and by December 2019, Petitioner reported his neuropathic pain was "much improved." *Id.* at 7356, 7407. Doctors noted that Petitioner would need to continue to receive treatment with Rituximab for MOG as a result of continued MOG-positive testing, and that treatment would need to continue "for at least two years." *Id.* at 7412.

## II.  Witness Testimony

### A.  Fact Witnesses

#### 1. *M.K.S.*

Petitioner was the first fact witness to offer testimony at hearing. *See generally* Tr. at 10–38. Petitioner recalled that he had no prior medical issues that he was aware of. *Id.* at 12. On March 9, 2018, Petitioner stated that he had an appointment with Dr. Hutchison for a routine checkup—he reported no ongoing complaints or concerns, and received the Tdap vaccine at that time. *Id.* at 13. He further testified that he was not suffering from any sort of intervening cold or infection when he received the vaccine at issue. *Id.* at 14.

On March 24, 2018, Petitioner had been suffering from a persistent headache for the last five days, and began experiencing double vision which prompted him to go to urgent care. Tr. at 14–15. Due to an elevated white blood cell count, Petitioner was transferred to the ER at Mercy Medical Center where he underwent a CT scan (the results of which were unremarkable). *Id.* at 16. He recalled being discharged that same day with instructions to monitor his symptoms. *Id*. The next day, Petitioner returned to urgent care with reports of an inability to urinate (a symptom that presented the previous night). *Id.* at 17. Following an examination, Petitioner was given a catheter and discharged home thereafter.[8] After returning home, Petitioner recalled trying to turn on the television, but in that moment, he forgot how to use the remote. *Id.* at 19. He stated that he continued to get worse as the night progressed—prompting him and his wife to return to the hospital. *Id.*

Petitioner was hospitalized from March 25th to April 26th, but could remember only a few details from his month-long stay. Tr. at 20. He maintained that his most lucid memory during that time period was the ambulance ride from the hospital to an inpatient rehabilitation facility for a one-week stay, which Petitioner was unaware of that being the next step in his treatment course. *Id.* at 22. While in rehab, Petitioner underwent both speech and occupational therapy and demonstrated significant improvement to finish his rehabilitation program on an at-home basis. Tr. at 25.

Petitioner then briefly discussed experiencing several relapses throughout his clinical course. On June 29, 2018, Petitioner recalled having issues in his left eye—explaining that his vision was essentially "grayed out" and his eye was "extremely painful to move" when he looked slightly to his left. Tr. at 26. As treatment, Petitioner was prescribed oral Prednisone. *Id.*

---

[8] Petitioner also mentioned that his legs began to move spastically while being catheterized, and that the PA who observed this lower extremity movement indicated some concern of a neurological problem. Tr. at 18.

Approximately eight months after (March 2019), Petitioner began experiencing more issues with his left eye, which later turned out to be the result of optic neuritis.[9]

By August 2020, Petitioner began experiencing symptoms in his lower body. He described a burning, painful sensation beginning from his "beltline" and intermittently working its way downward until resolving on its own. Tr. at 27, 28. Several months later (December 2020), Petitioner started experiencing similar eye issues, only this time it was in his right eye. *Id.* at 28. He explained that as soon as he started having issues with his right eye, the pain in his left eye resolved. *Id.* Petitioner was once again treated with a five-day course of Solu-Medrol IV and an oral Prednisone taper thereafter. *Id.* He stated that he received IVIG treatment every thirty days and since then Petitioner has not experienced any additional relapses. *Id.* at 29.

Regarding his current status, Petitioner is fatigued on a day-to-day basis and in "constant pain." Tr. at 31. Not only does Petitioner struggle with his memory and focus, but his balance as well. While he can walk unassisted, Petitioner maintained that in the last two years he has had approximately five to six falls due to balance issues. *Id*. at 31, 23. He briefly attended a support group but essentially did not feel comfortable. *Id.* at 33. Petitioner stated that he is still employed but he no longer develops software, and instead only tests the software. *Id.*

Petitioner concluded his testimony emphasizing the impact his MOGAD has had on his daily living, on his wife and daughter, and noted that it "supersedes everything," and that he is no longer able to do things with his family he once could. Tr. at 34.

### 2. *Cheryl Schromen*

Mrs. Schromen was the final fact witness to testify at hearing. *See generally* Tr. at 38–51. She similarly stated, like her husband, that Petitioner did not have any medical issues, other than occasional allergies, prior to his receipt of the vaccination at issue. *Id.* at 39. She further acknowledged Petitioner's drinking habits, but maintained that by March 2018, he had cut back significantly. *Id.*

Mrs. Schromen recalled Petitioner receiving the vaccination at issue on March 9, 2018, during his annual appointment with Dr. Hutchison. Tr. at 40. Approximately a week and a half thereafter, Mrs. Schromen noted that Petitioner began to experience a variety of symptoms, specifically, severe headaches followed by double vision, profuse sweating and shaking. *Id.* at 40, 41. And at no point in time, prior to the onset of Petitioner's symptoms, did he have any sort of cold or infection, according to Mrs. Schromen.

---

[9] "Optic Neuritis" is defined as "Inflammation of the optic nerve; it is classified as either intraocular, affecting the part of the nerve within the eyeball, or retrobulbar, affecting the portion behind the eyeball." *Optic Neuritis*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=92519&searchterm=optic+neuritis (last visited Jan. 29, 2026).

On March 24, 2018, Mrs. Schromen described taking Petitioner to urgent care as his headache and double vision were progressively getting worse. Tr. at 41. While there, Petitioner's treaters ran his lab work—the results of which revealed an elevated WBC—and urged Petitioner to go to the ER for further evaluation. *Id.* After presenting to the ER, Mrs. Schromen recalled Petitioner undergoing a CT scan, but the results were essentially unremarkable, and they opted to go home. *Id.* at 42. The next day, however, Petitioner returned to urgent care as he was having difficulties urinating, and he was subsequently catheterized. *Id.* at 43. In addition to Petitioner's urinary issues, Mrs. Schromen also recalled that Petitioner was quite "tremulous" and his legs "were out of control." *Id.* The PA urged Mrs. Schromen to keep an eye out for any additional symptoms, such as issues with Petitioner's speech or gait, as it might suggest an underlying neurological problem. *Id.* Petitioner and his wife returned home later that day, only to present to Finely Hospital the next day, March 26, 2018. Mrs. Schromen testified that when she and her husband returned home from urgent care on March 25, 2018, Petitioner's symptoms progressively got worse, explaining that he was shaky and sweating profusely, and he began exhibiting some neurological concerns, such as not being able to turn on the television. *Id.* Although she wanted to take him to the ER that night, Mrs. Schromen explained that Petitioner was exhausted, and that they had planned to follow-up with his PCP in the morning. *Id*. at 44.

The morning of March 26, 2018, Mrs. Schromen recalled, she initially had a difficult time getting Petitioner out of bed, but she was eventually able to rouse him and take him to the Finely ER. Tr. at 44, 45. Due to concern for possible meningitis or encephalitis, Petitioner underwent a spinal tap, but the results were deemed indecipherable, leading treaters to start antivirals and antibiotics prophylactically and transfer him via ambulance to Iowa City. *Id.* at 45. Once at Iowa City, Mrs. Schromen recalled the first two weeks of Petitioner's hospital stay as "very touch and go" with his symptoms intermittently improving but then getting worse. *Id.* at 46. Following the first two weeks, treaters were under the impression that Petitioner was stable enough to continue treatment at home on an outpatient basis; however, this quickly changed, and Petitioner was transferred to the intensive care unit where he was subsequently intubated. Because treaters were still uncertain as to Petitioner's diagnosis, they opted to perform a brain biopsy—the results of which suggested ADEM—and Petitioner was treated with IVIG and Prednisone. *Id.* at 47. Mrs. Schromen stated that prior to being treated with IVIG and Prednisone, Petitioner was not lucid and did not recognize her, but within approximately four days post-treatment, she noticed significant improvement. *Id.* Petitioner was discharged to Mercy Inpatient Rehab on April 25, 2018.

Mrs. Schromen then briefly discussed Petitioner's current status since receiving regular IVIG treatment. Tr. at 49. For the most part, Petitioner remains in stable condition and has experienced minimal relapses. As for any remaining deficits, Mrs. Schromen maintained that Petitioner struggles with his long-term and short-term memory, as well as his balance, he is constantly fatigued; however, the most significant deficit is his overall pain. *Id.* Mrs. Schromen concluded her testimony noting that Petitioner's injury has greatly impacted their lives and affected many of the activities they were once able to do as a family and no longer can. *Id.* at 49, 50.

8

B. Petitioner's Experts

1. *Carlo Tornatore, M.D.*

Dr. Tornatore is a neurologist, and he prepared two written reports and testified on behalf of Petitioner. *See generally* Tr. at 51–155; Report, dated Aug. 24, 2022, filed as Ex. 20 (ECF No. 28-1) ("First Tornatore Rep."); Report, dated July 26, 2023, filed as Ex. 44 (ECF No. 33-1) ("Second Tornatore Rep."). Dr. Tornatore opined that Petitioner's receipt of the Tdap vaccine on March 9, 2018, was the likely sole cause of his development of MOGAD. Tr. at 65.

Dr. Tornatore graduated from Cornell University with a Bachelor of Arts and Sciences in Neurobiology, and attended Georgetown University Medical Center, where he received a Master of Science in Physiology. He subsequently graduated from medical school at Georgetown University School of Medicine, completing a residency in the department of Neurology at Georgetown University Hospital. Tr. at 52. Dr. Tornatore also completed a fellowship in Molecular Virology at the National Institute of Health in Bethesda, Maryland. First Tornatore Rep. at 2. He has published multiple articles addressing demyelinating disorders and their pathology. Currently, Dr. Tornatore serves as a Professor and Chairman of the Department of Neurology at Georgetown University Medical Center, Chairman and Neurologist-in-Chief of the Department of Neurology at Medstar Georgetown University Hospital in Washington, D.C., and Medstar Health's Regional Director of Neurology. Tr. at 52; First Tornatore Rep. at 1. He has evaluated and treated, among other various inflammatory conditions of the brain and spinal cord, approximately 200 patients with prior episodes of ADEM, and 115 patients with neuromyelitis optica spectrum disorder ("NMOSD) and MOGAD. First Tornatore Rep. at 2.

Dr. Tornatore began his testimony with a brief description of MOGAD and how the medical community's understanding of the new diagnostic classification has evolved in the past several years. He then turned to the schools of thought regarding MOGAD's etiology. Tr. at 61. Like other demyelinating diseases, an antecedent viral infection or any type of infection could lead to MOGAD (usually via the mechanism molecular mimicry—discussed in more detail below). *Id.* at 62. Similarly, there are some cases where a preceding vaccination leads to the development of MOGAD, versus cases where its trigger remains unknown. *Id.*; *see also* M. Netravathi et al., *COVID-19 Vaccine Associated Demyelination and its Association with MOG Antibody*, 60 Multiple Sclerosis and Related Disorders 1 (2022), filed as Ex. 33 (ECF No. 28-14) (concluding that "[t]he temporal association with the vaccination, the disproportionate number of patients affected following different vaccine brands, and the presence of MOG antibodies in a substantial proportion of these individuals raises the possibility of an immunogenic process triggered by the vaccine in susceptible individuals."). Dr. Tornatore did acknowledge, however, that vaccination would be rare as the triggering event (especially since MOGAD is such a rare disorder to begin with). *Id.* Thus, in order to identify the cause of MOGAD in a particular individual, Dr. Tornatore stated that treaters essentially seek to identify from an individual's medical course the specific antigen that likely impacted an individual's immune system. *Id.* at 63.

9

Turning to the specific facts herein, Dr. Tornatore first noted that Petitioner was without any ongoing complaints or concerns at the time of his vaccination, and that his PCP was pleased with how Petitioner responded to new anxiety medication. Tr. at 68. In his review of the relevant medical records, Dr. Tornatore did not identify any neurological issues prior to administration of the Tdap vaccine. *Id*. Thus, as of his March 9, 2018, appointment with Dr. Hutchinson, Petitioner was *not* experiencing any headaches at that time, and a neurological review of systems was negative (i.e., no dizziness, no motor disturbances, no sensory disturbances, no weakness, no joint stiffness or joint pain was observed). *Id.* at 68, 69. The medical records from Petitioner's urgent care visit on March 24, 2018, however, revealed that his immune system had now been activated, as lab work revealed an elevated WBC, reflecting increased absolute neutrophil and monocyte counts, as well as an elevated c-reactive protein (which is evidence of inflammation). *Id.* at 70, 72. Dr. Tornatore allowed that such findings were supportive of the presence of some infection (more likely bacterial than viral)—yet Petitioner exhibited no signs or symptoms, such as an upper respiratory infection, during this visit, that would be consistent with an infection. *Id.*

The medical records from approximately ten days post-vaccination clearly document Petitioner's complaints of new onset of headaches, followed by other symptoms like double vision. Tr. at 75. These symptoms, in conjunction with Petitioner's lab work, represent a relatively accurate initial clinical presentation of MOGAD, according to Dr. Tornatore. *Id.* Moreover, Petitioner's timeline regarding onset and the progression of symptoms was consistent with an autoimmune response to the receipt of the Tdap vaccine. *Id*.

Dr. Tornatore discussed some of the initial diagnostic testing that Petitioner underwent. Petitioner's CT scan revealed no tumor, and there was no collection of pus or abscess in the brain, ruling out a large lesion that could potentially cause the headaches or other neurologic-like symptoms he had been experiencing. Tr. at 77. While Dr. Tornatore acknowledged that Petitioner's CT scan did not rule out meningitis, he deemed the waxing and waning of Petitioner's symptoms "strongly suggest[ed] that this [wa]s not an infectious etiology that [was] ongoing." *Id.* at 79.

Similarly, the progression of Petitioner's symptoms (i.e., headaches and nonspecific complaints to urinary issues) was more consistent with the kind of neurologic concerns that would been seen in the context of MOGAD, as they reflected inflammation of the meninges that were adjacent to the spinal cord, leading to significant changes to his overall bladder functionality. Tr. at 81. Indeed, the level of bladder complications Petitioner was experiencing, coupled with the fact that his symptoms were limited to the bladder itself—outside of the initial headaches—"strongly suggests [that] it [is] an inflammatory process and strongly suggests it is not a viral process of the spinal cord or the adjacent meninges," as Petitioner would have been significantly sicker, according to Dr. Tornatore, were he battling an ongoing infection. *Id.* at 83.

Dr. Tornatore next discussed the relevance of Petitioner's other emerging symptoms— blurry vision, fever, chills, diaphoresis, nausea, vomiting, and light-headedness. Tr. at 86. Dr. Tornatore opined that Petitioner's inflammation had now progressed, essentially affecting more

10

nerves in the spinal cord and the brain—those descending the spinal cord and responsible for controlling Petitioner's ability to move his lower extremities, as well as those ascending into the brain and affecting his cognitive abilities. *Id*. at 86, 88. In addition, Dr. Tornatore emphasized the significance of Petitioner's persistent febrile condition throughout the course of his hospitalization at the University of Iowa—noting that Petitioner was given antiviral medications and high-dose antibiotics that should have been effective in treatment of a viral infection, yet he was continuing to get worse, remaining febrile for approximately twelve to fourteen days. *Id.* at 88, 90. And despite undergoing a number of diagnostic tests, there was no evidence generated to identify an infectious etiology for the inflammation and related symptoms. *Id.* at 91.

The imaging evidence was also not, in Dr. Tornatore's view, inconsistent with MOGAD. There is oftentimes a radiographic lag "where some[one] can have symptoms with MOGAD, the MRI looks normal, and then [the inflammation] will [become noticeable] thereafter," usually a week or two later.[10] Tr. at 92. Dr. Tornatore further explained that this radiographic lag is likely attributable to low-grade inflammation that essentially cannot be picked up as a result of the nature of the scan—although viral-caused disorders of the nervous system will more readily reveal inflammation. *Id.* Comparing the results of Petitioner's two MRI scans (one performed 3/26/2018 and the next on 4/1/2018), Dr. Tornatore noted that the first did not reveal anything remarkable, despite Petitioner having progressive clinical symptoms and an elevated WBC, but evidence of inflammation typical of ADEM could be observed on the second scan. *Id.* at 93. Were this a *viral* meningitis, Dr. Tornatore maintained (and thus the product of an active infectious process), Petitioner's initial MRI should have shown more abnormal findings. *Id.*

In addition to Petitioner's diagnostic testing results, Dr. Tornatore deemed significant the presence of eosinophils, neutrophils, and monocytes in Petitioner's lab results. Eosinophils are commonly a sign of some allergic reaction to inflammation, and not directly associated with viral or bacterial meningitis. Tr. at 95. At the time Petitioner's lab results demonstrated the presence of eosinophilia, Petitioner remained febrile and symptomatic, indicating a likely immune-mediated etiology—but one not due to viral infection. *Id.* Moreover, Petitioner's minimal improvement once placed on antiviral and antibiotic agents was, in Dr. Tornatore's opinion, "a very, very strong indicator that the underlying etiology was not, in fact, [bacterial] [or] [viral] [meningitis]." *Id.* at 98. And a PCR panel returned negative results for many of the bacteria and viruses typical of causing meningitis (i.e., E. coli, Haemophilus, Neisseria, Enterococcus, Enterovirus). *Id.* at 105, 106; Ex. 7 at 7088. Indeed, Dr. Tornatore noted that it was not until *after* immunosuppressive therapy had been initiated that Petitioner became non-febrile—at which time he demonstrated almost immediate improvement. *Id.* at 99, 119. This was further evidence diminishing a viral/wild infectious explanation for Petitioner's symptoms.

---

[10] Dr. Tornatore acknowledged that he did not submit the papers that support this proposition, as they were recently published (i.e., too close-in-time to the hearing date).

Other evidence Dr. Tornatore deemed relevant to his assessment of the etiology of Petitioner's MOGAD was the April 11, 2018 brain biopsy. Treaters chose to perform it because previous lab workup and diagnostic testing proved inadequate in identifying an etiology. But it showed no brain vasculitis (i.e., inflammation of blood vessels) or hemorrhaging, and did not identify any infectious organisms. *Id.* at 113, 115, 116. A neurology record from approximately one-week after also suggested that Petitioner's repeat cerebrospinal fluid testing had again revealed an elevated WBC and high protein count, which could likely reflect changes post-brain biopsy, and was more consistent with an active inflammatory process (as opposed to resolved infection). *Id.* at 113 (referencing Ex. 7 at 6819).

Dr. Tornatore then briefly addressed the relevance of Petitioner's reported relapses. He noted that once MOGAD had been identified as the diagnostic explanation for Petitioner's presentation, Petitioner's treating neurologist recommended he follow-up in six-months post-hospitalization and re-check his MOG assay, "if [the] [MOG] [assay] [was] positive then [Petitioner] may require a steroid sparing agent, but if negative it may indicate that ADEM and positive MOG was post[-]infectious and more likely monophasic." Tr. at 120 (citing Ex. 7 at 6827). Petitioner's repeated relapses of optic neuritis, Dr. Tornatore maintained, were not consistent with a post-infectious process. *Id.* at 121. Thus, in analyzing the totality of the medical records, Dr. Tornatore concluded his direct testimony maintaining his overall opinion—that Petitioner's MOGAD was more likely than not caused by his receipt of the Tdap vaccination he received on March 9, 2018. *Id.* at 136.

On cross-examination, Dr. Tornatore reiterated his opinion regarding the strength of the testing findings that could not identify a viral etiology herein. Tr. at 143. He acknowledged, however, that like other demyelinating diseases, there are many instances in which an etiology is not discovered. *Id.* at 159.

### 2. *Lawrence Steinman, M.D.*

Dr. Steinman is a highly-credentialed neurologist and immunologist, and he offered two written reports and testified on behalf of Petitioner's claim. *See generally* Tr. at 161–188; Report, dated July 24, 2023, filed as Ex. 51 (ECF No. 33-8) ("First Steinman Rep."); Report, dated Mar. 18, 2024, filed as Ex. 76 (ECF No.45-1) ("Second Steinman Rep.").

As shown in his CV, Dr. Steinman received his undergraduate degree from Dartmouth College, and his medical degree from Harvard Medical School. *See* Curriculum Vitae, filed as Ex. 54 (ECF No. 33-11) ("Steinman CV") at 1. He then completed residencies in neurology and pediatrics at Stanford University. *Id.* He has worked as a professor of neurology and pediatrics at Stanford for the past 43 years. *Id.*; First Steinman Rep. at 1. He is board certified in neurology from the American Board of Psychiatry and Neurology. Steinman CV at 2. In addition, Dr. Steinman has published hundreds of peer-reviewed publications on the topics of neurology and autoimmune diseases. *Id.* at 5–51. He holds several patents related to the diagnosis and treatment of autoimmune and demyelinating diseases. *Id.* at 2–3. Presently, he serves as the George A.

12

Zimmerman Professor of Neurological Sciences, Neurology, Genetics and Pediatrics at Stanford University. *Id.* at 1.

Dr. Steinman agreed with Dr. Tornatore regarding MOGAD as the proper diagnosis herein, explaining that it is "a complex inflammatory condition of the central nervous system" that manifests in a variety of ways. Tr. at 166. Dr. Steinman opined that Petitioner's receipt of the Tdap vaccine on March 9, 2018, led to his subsequent development of MOGAD, via the mechanism of molecular mimicry. *Id.* at 167. Molecular mimicry, explained Dr. Steinman, is a process by which structures within the immune system mimic the structures of what Dr. Steinman described as "foreign invaders"—antigens presented to the immune system—and the immune system sometimes cannot distinguish between the two. *Id.* As a result, the immune response to the foreign antigen (intended to eliminate or attack it) gets misapplied to self, resulting in autoimmune harm.

For sufficient similarity between a foreign and self-peptide sequence to spark such an autoimmune cross-reaction, Dr. Steinman maintained, "having five identical amino acids in a linear stretch of [twelve] amino acids is in some notable cases sufficient." Tr. at 168. In support, Dr. Steinman briefly discussed his methodology for identifying potential mimics in general, explaining that he first utilizes BLAST[11] searches to find sequences common to a vaccine-containing antigen and self-structure theorized to be relevant, before inputting the mimics into the Immune Epitope Database (the "IEDB") to confirm that a possibly-significant self-antigenic target exists. *Id.* at 173, 175. Here, Dr. Steinman opined that he had identified some molecular mimics between the Tdap vaccine and the MOG protein which could be sufficient to trigger such an autoimmune response. Tr. at 176. He did so through identification of mimics between the pertussis toxin and the MOG protein (five out of eleven amino acids), as well as the diphtheria toxin and the MOG protein (five out of twelve amino acids). *Id.* at 177.

The timeframe in which Petitioner's MOGAD began was also medically acceptable for vaccine causation, in Dr. Steinman's view. Petitioner's initial symptoms of headaches and double vision began approximately ten days post-vaccination, followed by fever and chills thirteen days post-vaccination. That timeframe was consistent with a vaccine-triggered process of autoimmune cross-reactivity attributable to molecular mimicry. Tr. at 171.

Dr. Steinman concluded his testimony noting that he could not identify an alternative cause for M.K.S.'s MOGAD. Petitioner underwent extensive testing throughout the course of his treatment, but there was no specific test result or indicator to suggest the presence of a viral or bacterial infection prior to or during Petitioner's hospitalization. Tr. at 181. Instead, the medical records are consistent with Petitioner having an autoimmune response to his receipt of the Tdap vaccine, leading to the culmination of an antibody response to MOG. *Id.* at 182.

---

[11] Basic Local Alignment Search Tool "find regions of similarity between biological sequences. The program compares nucleotide or protein sequences to sequence databases and calculates the statistical significance." *Blast Local Alignment Search Tool*, https://blast.ncbi.nlm.nih.gov/Blast.cgi (last visited Jan. 29, 2026).

13

C.    Respondent's Experts

1.  *Eric Lancaster, M.D., Ph.D.*

Dr. Lancaster, a neurologist, offered two written reports and testified on behalf of Respondent. *See generally* Report, dated Dec. 19, 2022, filed as Ex. A (ECF No. 31-1) ("First Lancaster Rep."); Report, dated Jan. 28, 2024, filed as Ex. E (ECF No. 41-1) ("Second Lancaster Rep."); Tr. at 191–246. Dr. Lancaster opined that M.K.S.'s MOGAD was more likely caused by viral meningitis (although he did not dispute the propriety of the MOGAD diagnosis). First Lancaster Rep. at 10.

Dr. Lancaster attended Johns Hopkins University for his undergraduate degree, and the University of Maryland School of Medicine for his medical degree and Ph.D. Curriculum Vitae, filed as Ex. B (ECF No. 31-2) ("Lancaster CV") at 1. He then completed his internship, followed by a neurology residency, a neuromuscular fellowship, and a research fellowship at the University of Pennsylvania, Philadelphia. *Id.*; Tr. at 192. Dr. Lancaster is also currently an Associate Professor of Neurology at the University of Pennsylvania. Lancaster CV at 2; Tr. at 193. Approximately 75% of his clinical practice is focused on autoimmune diseases of the central nervous and peripheral nervous systems, whereas his research lab primarily focuses on the detection of neuronal autoantibodies. Tr. at 194. Dr. Lancaster is board by the American Board of Psychiatry and Neurology, with subspecialty certifications in Electromyography and Neuromuscular Medicine. *Id.*; Lancaster CV at 2. He has authored over 30 peer-reviewed publications, a majority of which focus on autoimmune neurological disorders and their mechanisms. First Lancaster Rep. at 1.

Dr. Lancaster agreed with Petitioner's experts that Petitioner had experienced MOGAD with associated ADEM, although he felt it developed secondarily, due to a preceding viral meningitis rather than vaccination. Tr. at 197, 202. MOGAD, he explained, is understood to be a clinical syndrome of symptoms in which individuals develop antibodies to the MOG nerve protein. *Id.* He further stated that MOG antibodies result in several different clinical phenotypes, the most common of which is ADEM. *Id.* ADEM is a self-limited, inflammatory disease of the central nervous system, and its criteria include "an alteration of consciousness, the appearance of brain lesions and brain inflammation on MRI, [or] the variable presence of a certain amount of inflammation in the spinal fluid." *Id.* at 199. In the context of the ADEM diagnostic criteria, clinical presentation is understood to be fairly "acute and self-limited, generally hitting its peak within several weeks and then having a slow improvement overtime." *Id.* at 199–200. It is also very common for ADEM to occur following an infectious process—including in some cases "meningitis and a wide variety of viral causes or other illness." *Id.* at 200.

Meningitis, Dr. Lancaster contended, can have a viral etiology (and is deemed "aseptic" when no particular precursor virus is identified, even if a viral cause is still suspected). First Lancaster Rep. at 9. It features "headache, fever, stiff neck, and other symptoms," and CSF tests

14

will reveal elevated WBC—although "cells may be neutrophils initially and then later more lymphocytes may be observed." *Id*. Moreover, "there are clear precedents for viral brain infections triggering secondary autoimmunity," with MOGAD features like ADEM or other forms of encephalitis known to follow infections. *Id.*

Here, Petitioner likely suffered from a viral meningitis beginning around March 19, 2018 (thus not long after the relevant vaccination). Dr. Lancaster noted that the medical records documented a reported headache and fever, an alteration in consciousness and mentation, and an elevated WBC—but no brain lesions that would suggest an inflammatory disease such as ADEM or MS already existed. He deemed this presentation consistent with an infectious cause. Tr. at 202. Moreover, he noted that Petitioner exhibited progressing symptoms and impairment over several days, then gradual improvement until approximately April 8, 2018, when Petitioner began to show signs of developing ADEM and became much worse symptomatically. *Id.* at 203. Based on Petitioner's initial presentation and symptom progression, Dr. Lancaster maintained, Petitioner likely experienced two "separate phases" of illness while in the hospital. *Id.* at 204. The initial phase, he explained, was "very much" due to a viral meningitis (demonstrated by an alteration in mentation, high CSF pleocytosis, and a lack of brain lesions), while the second phase was characterized by a "dramatic clinical decline" (i.e., the sudden appearance of brain lesions characteristic of ADEM, as well as a decreased CSF pleocytosis). *Id.* at 205. Accordingly, in Dr. Lancaster's view, Petitioner's MOGAD developed secondarily, in the wake of the resolution of the preexisting infectious meningitis.

To support this distinction between the first, putatively-viral phase of Petitioner's illness and his later MOGAD, Dr. Lancaster highlighted Petitioner's various lumbar punctures and the significance of the increased WBC/neutrophil findings. *See generally* Second Lancaster Rep. at 1–2. Dr. Tornatore had maintained that Petitioner's initial CSF testing results, which revealed high levels of WBCs, were inconsistent with viral meningitis, given the presence of neutrophils (which he maintained are detectable in approximately half of specimens with MOG-associated disorders). First Tornatore Rep. at 20. But Dr. Lancaster argued that a high WBC count was in fact *uncommon* in MOGAD. First Lancaster Rep. at 9 ("white blood cells greater than 300 would be very uncommon and levels about 1000 are not reported in most large case series [for MOGAD]"); T. Armangue et al., *Associations of Paediatric Demyelinating and Encephalitic Syndromes with Myelin Oligodendrocyte Glycoprotein Antibodies: A Multicentre Observational Study*, 19 Lancet Neurol 24 (2020), filed as Ex. A3 (ECF No. 44-3); Second Lancaster Rep. at 1.

At the same time, however—and contrary to Dr. Tornatore's opinion—Dr. Lancaster contended that medical literature stood for the proposition that it is *common* for an individual to have a neutrophilic pleocytosis with viral meningitis. B. Negrini et al., *Cerebrospinal Fluid Findings in Aseptic Versus Bacterial Meningitis*, 105 Pediatrics 316 (2000), filed as Ex. E1 (ECF No. 41-2) ("Negrini"). Negrini reviewed 138 cases of aseptic but presumed-viral encephalitis in a pediatric population, with more than half of the studied subjects experiencing "neutrophilic predominance." Negrini at 317; Second Lancaster Rep. at 1. And this predominance was not only

15

seen in initial lumbar punctures. Dr. Lancaster also discounted the relevance of WBC levels determined from peripheral blood tests as unreliable for distinguishing between forms of meningitis. *Id.* In addition, Petitioner underwent his first lumbar puncture (which revealed an elevated WBC and neutrophils) relatively early into his treatment, and the results generated were (in Dr. Lancaster's view) "exactly what [one] [would] expect from viral meningitis at that time." Tr. at 212. Dr. Lancaster ultimately deemed the CSF testing results more consistent "with the range reported for viral meningitis, but unusually high for MOGAD." First Lancaster Rep. at 10.

However, by the time Petitioner underwent a second lumbar puncture following the sudden discovery of brain lesions from the second brain MRI in April, Petitioner's ADEM was obvious, regardless of neutrophil levels. Tr. at 213. Thus, Dr. Lancaster deemed the results of the second and third lumbar punctures to be essentially unhelpful when deciphering the underlying cause of Petitioner's disease process.[12] Other symptoms, like fever, were also in Dr. Lancaster's view of no use in distinguishing between possible causes for Petitioner's MOGAD. Both viral meningitis and MOGAD can be associated with fever, and thus Dr. Lancaster expressed skepticism that Petitioner's febrile status during his disease progression was a reliable way to evaluate possible causal explanations. Petitioner's medical records documented intermittent fevers prior to the appearance of his ADEM (the most obvious clinical feature of his MOGAD), but the persistence of fever *prior* to that time did not mean a viral infection could not have started off the disease process. Tr. at 213, 214. In addition, Dr. Lancaster did not take much stock in the fact that Petitioner tested negative for a number of possible viruses —explaining that "viral meningitis is a difficult problem because of the sheer number of different viruses that could potentially cause [it]."[13] *Id.* at 216. At bottom, Dr. Lancaster favored CSF testing findings as most helpful in identifying whether Petitioner experienced aseptic meningitis.

Dr. Lancaster concluded his testimony discussing the notion of aseptic meningitis (which would not commonly appear with brain lesions) resulting in MOGAD. He noted that "the classic form of encephalitis associated with MOGAD is ADEM, where there are brain lesions[,] [s]ometimes spinal cord lesions, [and] sometimes also optic nerve lesions." Tr. at 218. While there are reports suggesting there may very well be a form of "pure" aseptic meningitis that does not feature brain or spinal lesions but still results in MOGAD, it would be incredibly uncommon. *Id.*

---

[12] Dr. Lancaster also emphasized that the last lumbar puncture Petitioner underwent on April 17, 2018, occurred approximately six days post-brain biopsy—an invasive procedure that will inevitably cause leakage of blood into the spinal fluid, as well as an inflammatory response. Thus, the high number of neutrophils observed at this time had to be attributed to the overall effects of the brain biopsy. Tr. at 211.

[13] On cross examination, Dr. Lancaster acknowledged the extensive testing Petitioner underwent to determine the presence of a viral or bacterial infection, but criticized the notion that identifying a specific virus or bacterium is crucial in determining whether to prescribe immunosuppressants, such as IVIG. Tr. at 225. Once Petitioner developed ADEM, it unlikely would have been a contraindication to procced with the various immunotherapies regardless of whether a viral cause was specifically identified. *Id.* Thus, if he were presented with an individual with either a viral or bacterial infection which subsequently triggered MOGAD, Dr. Lancaster maintained he would still proceed with the immunotherapy treatments. *Id.* at 226. To further bolster this position, Dr. Lancaster argued that there is no evidence to suggest that IVIG weakens an individual's response to a viral or bacterial infection. *Id.* at 227.

at 219; T. Suzuki et al., *Aseptic Meningitis as an Initial Manifestation of Anti-myelin Oligodendrocyte Glycoprotein Antibody-associated Disease*, 58 Internal Med. 3319, 3320–21 (2019), filed as Ex. A5 (ECF No. 44-5) (discussing a single adult patient reporting headache, nausea, vomiting, and fever, and no encephalitic symptoms at initial presentation; patient was diagnosed with meningitis but later found to have MOG antibodies and then demyelinating lesions); Second Lancaster Rep. at 2. In Dr. Lancaster's view, the more probable explanation for Petitioner's injury was a viral meningitis that subsequently triggered his ADEM due to MOGAD. Tr. at 220, 223.

On cross examination, Dr. Lancaster acknowledged that he was unable to isolate any symptoms that Petitioner experienced, from the date of vaccination and onward, that more likely supported his preferred diagnosis of viral meningitis over MOGAD. Tr. at 231. Instead, Dr. Lancaster argued that in distinguishing between the two as causal, he relied on Petitioner's imaging and lumbar puncture results, as well as the biphasic nature of his illness and its up and down course. *Id.* at 232. He also admitted that Petitioner never reported any upper respiratory symptoms prior to his development of MOGAD that might be consistent with the existence of a viral infection, but nevertheless maintained that Petitioner likely contracted a virus several days before his initial clinical decline, and that otherwise the symptoms Petitioner did experience were temporally consistent with the time it would take for them to manifest post-infection. *Id.* at 238.

1. *Martin J. Cannon, Ph.D.*

Dr. Cannon, an immunologist, offered two written reports and testified on behalf of Respondent. *See* Report, dated Dec. 19, 2022, filed as Ex. C (ECF No. 31-3) ("First Cannon Rep."); Report, dated Jan. 29, 2024, filed as Ex. F (ECF No. 42-1) ("Second Cannon Rep.").

Dr. Cannon attended the University College London for his undergraduate degree, and the University of London for his Ph.D. in immunology. Tr. at 247; Curriculum Vitae, filed as Ex. D (ECF No. 31-4) at 1. He then completed a fellowship in the immunology of virus infections at the UK National Institute for Medical Research. Tr. at 247; First Cannon Rep. at 1. He is currently a Professor of Microbiology and Immunology at the University of Arkansas, College of Medicine. *Id.* There, Dr. Cannon served as the Director of Disease and Defense from 2015 to 2021, and included the overall responsibility for teaching foundational pathology, immunology, and microbiology to medical students. Tr. at 248; First Cannon Rep. at 1–2. He has published approximately 120 papers, the majority of which focus on viral immunology or cancer immunology. First Cannon Rep. at 1.

Dr. Cannon began his testimony opining that "the triggering event for ADEM and MOGAD was more likely viral encephalitis—or viral meningitis." Tr. at 250. To support his opinion, Dr. Cannon first noted that there are numerous viruses associated with meningitis or encephalitis, but that a great deal of these viruses would likely not have been detected by the PCR panel. *Id.* Secondly, he was unable to find any epidemiologic studies associating the Tdap vaccine with any demyelinating disease in humans. *Id.*

In response to Dr. Steinman's use of a BLAST search for sequence alignments in the pertussis toxin and MOG, Dr. Cannon argued that they only shared 45 percent homology, which suggested a very low probability of immune reactivity. Tr. at 252; Second Cannon Rep. at 4. A "landmark" study on the cross-reactivity potential from sequential homology demonstrated sequence cross-reactivity based on *six* consecutive identical amino acids, whereas the papers referred to by Dr. Steinman deemed five of twelve amino acids, and at various positions in the sequence as well, to be enough. Tr. at 252; R. Fujinami & M. Oldstone, *Amino Acid Homology between the Encephalitogenic Site of Myelin Basic Protein and Virus: Mechanism for Autoimmunity* 230 Science 1043, 1044 (1985), filed as Ex. F4 (ECF No. 42-5); *compare* A. Gautam et al., *A Polyalanine Peptide with only Five Native Myelin Basic Protein Residues Induces Autoimmune Encephalomyelitis*, 176 J. Exp. Med. 605 (1992), filed as Ex. 64 (ECF No. 34-5). Of the papers Dr. Steinman offered, Dr. Cannon noted, two relied heavily on "the alanine[14] substitutions of peptide sequences and the use of complete Freund's adjuvant for immunization" as an experimental condition not consistent with actual, in *vivo* cross-reactivity. Tr. at 254. There was thus no way to know exactly how comparable the acute inflammatory disease Petitioner suffered from would bear in comparison with the experimental conditions those items of literature discussed. *Id.* at 257.

Similarly, Dr. Cannon reviewed the significance of Dr. Steinman's findings via the IEDB. He acknowledged that Dr. Steinman's search between the sequences between the diphtheria toxin and MOG compared appropriate, potentially cross-reactive mimics, but stressed that of the sequences that overlapped, only eight amino acids fell within a known sequence as described by the IEDB, and only two were actually congruent. *Id.* at 259, 260. In Dr. Cannon's opinion, such findings are insufficient for immune cross-reactivity. *Id.* at 260, 261. Moreover, "the immunological evidence from the IEDB database for potential cross-reactivity between diphtheria toxin and MOG is negligible to non-existent." Second Cannon Rep. at 5.

Conversely, Dr. Steinman's analysis of the tetanus toxin and MOG sequences produced five of twelve identical amino acids—consistent with what Dr. Steinman deemed sufficient for cross-reactivity. Second Cannon Rep. at 5. Indeed, the core tetanus sequence shares five of seven amino acids with the core MOG sequence, and both are components of epitopes for tetanus toxin and MOG in the IEDB. *Id.*; Tr. at 262. Yet the IEDB, according to Dr. Cannon, describes the MOG sequence as a T-cell epitope, "as opposed to an antibody epitope, which would be central to the pathogenesis of MOG antibody-related ADEM." Second Cannon Rep. at 6 (citing L. Hofer et al., *Comparative Analysis of T-Cell Responses to Aquaporin-4 and Myelin Oligodendrocyte Glycoprotein in Inflammatory Demyelinating Central Nervous System Diseases*, 11 Frontiers in Immunology 1, 9 (2020), filed as Ex. F6 (ECF No. 42-7) (finding MOG-specific CD4$^+$ T cell reactivity was not associated with MOG antibody responses, and thus, no disease-relevant MOG T cell peptides were identified); A. Shetty et al., *Immunodominant T-cell Epitopes of MOG Reside*

---

[14] Dr. Cannon emphasized that alanine is a very small amino acid, and therefore, its structural impact is minimized. Tr. at 253.

*in its Transmembrane and Cytoplasmic Domains in EAE*, Neurol. Neuroimmunol. Neuroinflamm. 1, 8 (2014), filed as Ex. F7 (ECF No. 42-8) (finding that the relevant MOG peptide did not cause EAE in mice and MOG-specific T-cells could not transfer autoimmune encephalitis into wild-type or highly susceptible immunodeficient mice). Thus, Dr. Cannon did not deem this homology showing to lead to the conclusion that cross-reactivity was likely simply *due* to it.

On cross examination, Dr. Cannon admitted that MOGAD is a relatively new and rare diagnosis, and that a vaccine-triggered MOGAD (even a rarer occurrence) could very well be probable, but he denied that the current epidemiological studies could corroborate the possibility. He thus maintained that to date there is no evidence to support the existence of a vaccine-induced MOGAD. Tr. at 272.

## III. Procedural History

The matter was originally assigned to a different special master before being reassigned to me in August 2021. Respondent filed his Rule 4(c) Report contesting Petitioner's right to compensation on January 21, 2022. *See* Report, dated Jan. 21, 2022 (ECF No. 25). Thereafter, the process of obtaining expert reports began, with the final report from Dr. Steinman filed in March 2024. The parties filed pre-hearing submissions, and a one-day Entitlement Hearing took place in Des Moines, Iowa, on February 10, 2025. *See* Petitioner's Brief, dated Oct. 29, 2024 (ECF No. 47); Respondent's Opposition Brief, dated Dec. 2, 2024 (ECF No. 48). After some post-trial expert supplementation, the matter became ripe in May 2025.

## IV. Applicable Legal Standards

### A. *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table— corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[15] There is no Table claim for vaccine-caused MOGAD.

---

[15] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. Appx. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or even a generally accepted medical theory. *Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Dep't of Health & Hum. Servs.*, 121 Fed. Cl. 230, 245 (Fed. Cl. May 6, 2015).

20

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.,* 146 F.4th 1113, 1122 (Fed. Cir. 2025); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V,

2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B.      *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd, Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those

professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything

23

reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

      C.      *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See*, *e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the

credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.    *Consideration of Medical Literature*

Both parties filed numerous items of medical and scientific literature in this case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted in this case, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

**ANALYSIS**

**I.    MOGAD and Program Treatment of it as a Vaccine Injury**

Petitioner's MOGAD diagnosis is uncontested, but some discussion of MOGAD as a disease classification is still appropriate. As I have noted in other cases, MOGAD is a rare, antibody-mediated (hence autoimmune) inflammatory demyelinating disorder of the CNS that presents with a variety of neurologic illnesses—including optic neuritis, ADEM, and transverse myelitis. *Ampofo-Addo v. Sec'y of Health & Hum. Servs.*, No. 21-1231V, 2025 WL 2463643 (Fed. Cl. Spec. Mstr. July 31, 2025); E. Flanagan & J. Tillema, *Myelin Oligodendrocyte Glycoprotein Antibody-Associated Disease (MOGAD): Treatment and Prognosis*, UpToDate (2023), filed as

Ex. 60 (ECF No. 34-1) ("Flanagan"). It occurs when MOG autoantibodies mistakenly attack MOG proteins on oligodendrocytes (the cells responsible for the creation of myelin in the CNS), leading to nerve demyelination and resulting in the clinical symptoms of the disorders associated with MOGAD (like ADEM). Flanagan at 1. Importantly, the MOG antibody itself has not been *proven* to be pathogenic—hence the name "MOG-antibody-*associated* disease (MOGAD)." *Ampofo-Addo*, 2025 WL 2463643, at *18. MOGAD's exact etiology is otherwise unknown, although it is generally thought to occur after an infection or, more rarely, after a vaccination. First Tornatore Rep. at 19.

Medical science has only recently identified the MOG autoantibodies and observed their potential relationship to the kinds of CSN-oriented demyelinating injuries that characterize MOGAD. Accordingly, there is a paucity of medical or scientific literature discussing MOGAD— and few Program cases addressing MOGAD as a potential vaccine injury. Petitioners have been successful, however, in demonstrating the anti-MOG antibody was vaccine-induced, causing an individual to experience a CNS demyelinating injury. *See, e.g.*, *White v. Sec'y of Health & Hum. Servs.*, No. 15-1521V, 2019 WL 7563239 (Fed. Cl. Spec. Mstr. Dec. 19, 2019) (HPV vaccine caused anti-MOG antibody-mediated TM). I have also so found. *Hock v. Sec'y of Health & Hum. Servs.*, No. 21-945V, 2024 WL 3826125 (Fed. Cl. Spec. Mstr. July 12, 2024) (petitioner satisfied his burden of proof for his claim that the influenza vaccine caused his MOGAD); *L.C. v. Sec'y of Health & Hum. Servs.*, No. 17-722V, 2021 WL 3630315 (Fed. Cl. July 2, 2021) (finding Tdap vaccine caused MOGAD in a minor). I note, however (and as reflected in my own decisions), that the showing deemed preponderant in cases involving MOGAD was still somewhat limited (reflective of the absence of significant scientific research on the pathogenicity and origin of the MOG antibody). *See, e.g.*, *L.C.*, 2021 WL 3630315 at *17–19; *Hock*, 2024 WL 3826125 at *19– 22 (petitioner satisfied causation mainly because Respondent did not sufficiently rebut the factors suggesting Petitioner's showing was preponderantly established).

I have also denied compensation in MOGAD cases, although the facts specific to the claimant's medical history have often been the lynchpin of such outcomes. *Ampofo-Addo*, 2025 WL 2463643, at *22-23 (Tdap vaccine not found to cause MOGAD; claimant was demonstrably very ill with viral infection (that occurred not long after vaccination, but closer in time to neurologic symptoms onset) more likely causal of her MOGAD). By contrast, I was more easily able to find MOGAD was vaccine-caused when a claimant had no evident prior health issues before the relevant vaccination. In *L.C.,* for example, a child's neurologic symptoms occurred a few weeks after vaccination, but in a context of general good health, with far less direct evidence that the child had been previously sick. *L.C.,* 2021 WL 3630315, at *1. The evidence that the *Hock* petitioner was experiencing some kind of intercurrent infection in the weeks prior to vaccination was a bit stronger, but that Petitioner had largely recovered by the time he received the relevant vaccine. *Hock,* 2024 WL 3826125, at *21.

Thus, while there is nascent Program recognition that vaccination *might* play a role in the propagation of these MOG antibodies, there is no Program consensus on the question, given the novelty of this diagnostic classification. At most, it appears that MOGAD may be a more precise scientific designation for several acute CNS injuries, like ADEM or optic neuritis, once thought to have independent status. In addition, it is unquestionably the case that prior to the MOGAD illness designation, the Program often compensated petitioners in cases alleging ADEM or optic neuritis had been vaccine-caused. *See, e.g.*, *Daniels v. Sec'y of Health & Hum. Servs.*, No. 07-462V, 2012 WL 763175 (Fed. Cl. Spec. Mstr. Feb. 16, 2012) (finding that the flu vaccine caused ADEM). It is reasonable to allow for the possibility that MOGAD may *also* have a legitimate vaccine association—although the matter is far from resolved.

## II.    Petitioner Did Not Likely Suffer from Viral Meningitis

Respondent's argument about causation (as primarily advanced through the testimony of Dr. Lancaster) relies on the finding that Petitioner *first* experienced a viral form of meningitis that secondarily resulted in his MOGAD. This contention is wholly reasonable and logical, for the evidence clearly establishes that medical science recognizes that infections can result in MOGAD. G. dos Passos et al., *MOG-IgG-Associated Optic Neuritis, Encephalitis, and Myelitis: Lessons Learned from Neuromyelitis Optica Spectrum Disorder*, 9 Front. Neurol. 1, 5 (2018), filed as Ex. A2 (ECF No. 44-2) (noting that a preceding infectious prodrome was reported in 47% of the studied cases). But the evidence *in this case* does not preponderantly establish that Petitioner's MOGAD was *also* likely caused by a prior viral infection—here, a viral meningitis.

First, there is an absence of evidence that would affirmatively establish the existence of a viral infection at the time of Petitioner's initial presentation on March 24, 2018. Petitioner had no viral-like symptoms at the time of vaccination, and while his subsequent presentation could *generally* be consistent with a virus despite its nonspecific nature, those symptoms (which *did not* involve classic upper respiratory concerns) could also be reflective of MOGAD as well (since many demyelinating diseases present with diffuse complaints like pain, headache, physical malaise, etc.). His primary complaints as of March 24th were headaches and vision issues, which arguably are more suggesting of existing neurologic issues. Ex. 2 at 86-87.

Second, and more significantly, Petitioner never tested positive for any particular viral infection. The fact that testing does not identify a virus in the wake of a person's illness does not mean one did not exist, and a wide variety of illnesses, including MOGAD, can be ultimately found to be idiopathic in cause. And a disease can clearly have an idiopathic origin; Respondent is never obligated to prove a precise viral explanation for an alleged vaccine injury. But Respondent in this matter cannot point to a particular test result or finding to corroborate the conclusion that Petitioner likely *had* experienced a viral infection leading to meningitis, and thus arguments about such a cause are more plausible in character than probable. Petitioner, by contrast,

27

persuasively demonstrated that he remained "persistently febrile from the time of admission on 3/26/2018 through 4/10/2018 despite being on antibiotics and antiviral medications, strongly suggesting that the etiology of his fever was non-infectious." Br. at 24 (citing First Tornatore Rep. at 12). Additionally, the medical records note that Petitioner demonstrated a rapid normalization of his temperature once immunosuppressive therapy was initiated in place of previous antiviral therapy, indirectly offering further support against the conclusion that the source of Petitioner's injury was viral. Second Tornatore Rep. at 5.

Third, Dr. Lancaster's distinction between different times in the course of Petitioner's disease, coupled with testing results he felt corroborated a viral meningitis, was inadequately corroborated. For example, Dr. Lancaster attempted to rebut Dr. Tornatore's view that the WBC/neutrophil findings in initial serologic testing were inconsistent with viral meningitis—but in so contending, was only successful in establishing that *either* MOGAD or a viral meningitis could feature high WBC levels initially. And Negrini is primarily useful in identifying a way to distinguish *bacterial* from viral meningitis—not viral versus a primary autoimmune process—and even its authors admit that these kind of WBC findings are not useful as a "sole criterion." Negrini at 319. The arguments about fever persistence and treatments that ameliorated fever also are somewhat more supportive of Petitioner's position.

I reiterate again that the MOGAD diagnosis *itself* is not in dispute. And I agree with Dr. Lancaster's contention that findings from *after* the time that diagnosis was accepted (once Petitioner's ADEM was diagnosed and then confirmed by imaging) do not help illuminate what caused the MOGAD in the first place. Thus, Respondent relies on evidence before that time to show a more likely viral cause. But that evidence is either lacking or too equivocal to conclude that Petitioner *likely* experienced an aseptic/viral form of meningitis that then resulted in an autoimmune reaction.

Respondent's diagnostic theory thus is not sufficiently preponderantly supported to accept, despite its logic. In other cases, more robust proof of a likely intervening infectious process would weigh against a finding of vaccine causation. But here, that evidence is lacking.

## A. **Petitioner Has Carried His *Althen* Burden of Proof**

### A. *Prong One*

Petitioner contends that that the Tdap vaccine can cause MOGAD. To do so, he relies on standard arguments about vaccine cross-reactivity that I have repeatedly questioned in other cases (and for good reason).[16] These general invocations of vaccine-induced molecular mimicry have

---

[16] Molecular mimicry is often invoked as the mechanistic "skeleton key" that unlocks how an autoimmune disease process may have occurred, but its general reliability does not render it more than a plausible mechanistic explanation

become hackneyed in the Program, and are overapplied, and in contexts to which they do not fit. And the very experts in this case who commonly invoke such theories have been—by me—directly criticized for lazy theorizing that assumes things about the Program burden of proof that are incorrect. *See, e.g.*, *Peterson v. Sec'y of Health & Hum. Servs.*, No. 22-322V, 2025 WL 3269458, at *30 (Fed. Cl. Spec. Mstr. Oct. 30, 2025); *K.A. v. Sec'y of Health & Hum. Servs.*, No. 16-989V, 2022 WL 20213037, at *29 (Fed. Cl. Spec. Mstr. Apr. 18, 2022), *mot. for review den'd*, 164 Fed. Cl. 98 (2022), *aff'd*, No. 2023-1315, 2024 WL 2012526 (Fed. Cir. May 7, 2024). Indeed, in *Ampofo-Addo,* I specifically criticized this kind of reasoning. *Ampofo-Addo,* 2025 WL 2463643, at *19-21 (*Althen* prong one not satisfied in MOGAD case).

Nevertheless—I find *in this case* the theory proposed had enough support to be deemed to have been preponderantly established, albeit by a hair. And my role in weighing the record evidence leads to this conclusion, despite my hard-earned knowledge that molecular mimicry as a vaccine causation theory has in many other Program contexts worn out its welcome.

First, it is relevant to my analysis that petitioners need not even offer a mechanism for causation (although when they do so it is fair to evaluate its probative worth). Here, the theory proposed was sufficiently reliable and persuasive to accept, and I do not find Dr. Cannon's testimony about the degree of homology more or less likely to result in cross-reactivity to have rebutted it.[17] Dr. Lancaster's views on the topic more arose from the general sense that science does not have much to say about the vaccine-MOGAD relationship—true as far as they go, but not rooted enough in actual evidence to give great weight to (especially given MOGAD's recency as an explanation for these kinds of CNS-oriented nerve injuries).

Second, I note that the Program has in the past often found CNS-oriented, acute demyelinating conditions like ADEM to be vaccine-associated. *See, e.g.*, *Kennedy v. Sec'y of Health & Hum. Servs.*, No. 09-474V, 2012 WL 1929801 (Fed. Cl. Spec. Mstr. May 8, 2012)

---

for vaccine causation. *McKown v. Sec'y of Health & Hum. Servs.*, No. 15-1451V, 2019 WL 4072113, at *50 (Fed. Cl. Spec. Mstr. July 15, 2019) (explaining that "merely chanting the magic words 'molecular mimicry' in a Vaccine Act case does not render a causation theory scientifically reliable, absent additional evidence specifically tying the mechanism to the injury and/or vaccine in question" (emphasis omitted)); *Forrest v. Sec'y of Health & Hum. Servs.*, No. 14-1046V, 2019 WL 925495, at *3 (Fed. Cl. Spec. Mstr. Jan. 28, 2019), ("[A] simple invocation of the term 'molecular mimicry' does not carry a petitioner's burden of proof. As explained by the Court of Federal Claims, 'Without any empirical evidence that the theory actually applies to the [vaccine and the disease in question], the first prong of *Althen* would be rendered meaningless.'" (*quoting Caves v. HHS*, 100 Fed. Cl. 119, 135 (2011), *aff'd*, 463 F. App'x 932 (Fed. Cir. 2012) (per curiam)).

[17] I have in fact stated in other cases that to some extent arguments about *how much* homology is needed for cross-reactivity "miss the boat," for causation purposes. *Peterson*, 2025 WL 3269458, at *27. Cross-reactivity in the context of an autoimmune disease is more persuasively rebutted with evidence that a relevant vaccine or its sub-components do *not* likely lead to disease—or that other factors are deemed more likely causal. Debates about homology do not usually rise about the level of whether vaccine might *plausibly* cause an injury from cross-reacting antibodies, and hence do not appreciably advance or prevent a preponderant showing.

(finding that petitioner who received the meningococcal and Tdap vaccines and then developed ADEM was entitled to compensation based on the theory of molecular mimicry); *Kuperus v. Sec'y of Health & Human Servs.*, No. 01-0060V, 2003 WL 22912885 (Fed. Cl. Spec. Mstr. Oct. 23, 2003) (awarding compensation in a DTaP/ADEM case based on the theory of immune-mediated attack); *Johnson v. Sec'y of Health & Hum. Servs.*, No. 99-0219V, 2000 WL 41582 (Fed. Cl. Spec. Mstr. July 27, 2000) (ADEM and Tdap vaccine). Indeed, Dr. Tornatore noted that it is likely that MOGAD, a relatively-recent discovery, might be a *better* classification for many of these conditions that were previously deemed vaccine-caused but viewed based on phenotype rather than associated autoantibody, as is now the case. Tr. at 55–56. Absent better rebutting evidence from Respondent based on more recent scientific and medical evidence, I am loathe to ignore these prior relevant determinations and their entitlement outcomes.

Overall—and also noting the competency of the experts, all of whom were more or less equally qualified or capable of offering the opinions they did—I find the preponderant standard for meeting the "can cause" element is met—although Petitioner herein was greatly assisted by the fact that medical science pertaining to MOGAD remains limited. I reiterate again: Petitioner's overall showing on the "can cause" prong was not all that well-substantiated, and could easily have been rebutted in other contexts. But it was not in this case.

B.     *Prong Two*

Consistent with my finding on the lack of preponderant evidence of a viral meningitis as explanatory for Petitioner's disease course, I also find there is enough proof to support the conclusion that the Tdap vaccine was likely causal of Petitioner's MOGAD. As noted in Petitioner's brief, his treating physicians allowed for the possibility that his development of ADEM/MOGAD was associated with receipt of the Tdap vaccine. Br. at 2, 13 (citing Ex. 7 at 6647). Moreover, by the time Petitioner's treating physicians settled on a diagnosis of ADEM/MOGAD, numerous alternative causes (i.e., viral illness, brain bleed, meningitis, Serotonin Syndrome, and alcohol withdrawal) had adequately been eliminated through extensive testing and evaluation. Petitioner received a very thorough work-up of his condition, but without any alternative explanation identified. And the headache and other symptoms he first presented with post-vaccination, while somewhat non-specific, are arguably more consistent with an autoimmune process then at work than with an intervening infection (which would have likely been corroborated by the kinds of respiratory or gastrointestinal symptoms common to a viral/bacterial infection). While this record is not particularly replete with evidence supporting the vaccine as specifically causal, there is enough to say Petitioner's preponderant evidentiary obligation has been met.

30

C.      *Prong Three*

The record supports the conclusion that Petitioner's post-vaccination presentation of neurologic-like symptoms that were likely reflective of his later-diagnosed MOGAD began no sooner than March 20th—eleven days post-vaccination. Ex. 2 at 86. This is fairly consistent with Dr. Steinman's view that onset occurred 13 days after vaccination. Tr. at 171. In either case, such a timeframe (onset within two weeks of vaccination) is consistent for a process of antibody production driven by vaccine exposure to occur and then cause the myelin harm that would begin to be evident clinically. *Kennedy*, 2012 WL 1929801, at *18 (petitioner received the vaccine approximately two weeks prior to the onset of symptoms); *Kuperus*, 2003 WL 22912885, at *10 (finding that onset between ten and 21 days was appropriate). Respondent's experts did not otherwise contest the medical acceptability of this timeframe, but for Dr. Cannon's assertion that "given the lack of association of meningitis or MOGAD-related ADEM with vaccination in the medical literature, there is a paucity of clinical data to establish a generally acceptable window for a causal relationship between the two events." First Cannon Rep. at 9–10.

## CONCLUSION

This is not a case in which Petitioner has overwhelmingly or all that convincingly carried his preponderant burden of proof. Rather, that burden has been met in the *barest* of fashions— enough to prevail upon, while leaving ample doubt that the Tdap vaccine could, or did, cause Petitioner's MOGAD. In future cases, I will be prepared to evaluate further whether MOGAD actually is likely vaccine-caused. That inquiry will surely be aided by scientific and medical developments relevant to the issue that remain to occur. And there is no guaranty that the over-relied upon theory of molecular mimicry will again be found sufficient to carry the day; as noted above, I find the mechanism to be over-applied in Vaccine Program cases as a general matter. But for now, based on the evidence before me (and taking into account consistent Program treatment of ADEM and comparable injuries), I determine that Petitioner has met his preponderant burden of showing causation. Petitioner is therefore entitled to compensation. A damages order shall follow.

**IT IS SO ORDERED**.

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master